


EXHIBIT A

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

December 19, 2011

## VIA FIRST-CLASS AND ELECTRONIC MAIL

The Honorable Joseph Maturo, Jr.
Mayor, Town of East Haven
250 Main Street
East Haven, Connecticut  06512

      RE:    <u>Investigation of the East Haven Police Department</u>

Dear Mayor Maturo:

We write to report the findings of the Civil Rights Division's investigation of the East Haven Police Department ("EHPD"), pursuant to the Violent Crime Control and Law Enforcement Act of 1994 ("Section 14141"), 42 U.S.C. § 14141, the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968 ("Safe Streets Act"), 42 U.S.C. § 3789d, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"). Section 14141 prohibits law enforcement agencies, such as EHPD, from engaging in activities that amount to a pattern or practice of violating the Constitution or laws of the United States. Title VI and its implementing regulations provide that recipients of federal financial assistance, such as EHPD, may not discriminate on the basis of race, color or national origin.  These laws give the United States the authority to file a legal action and obtain the necessary relief to ensure compliance with the Constitution and laws of the United States.

Our investigation, which began in September 2009, focused on allegations that EHPD officers engage in biased policing, unconstitutional searches and seizures, and the use of excessive force.  This investigation was conducted completely separate from, and the findings contained in this letter do not contain any information collected during, any ongoing federal criminal investigations involving EHPD.

Our investigation has been exhaustive.  We reviewed a large volume of documents from the Police Department, interviewed police and Town officials, and met with diverse members of the East Haven community.  In reaching our findings, we relied on highly respected consultants who have extensive experience in the delivery of police services, biased policing, and data and statistical analysis.

Based on our review, we find that EHPD engages in a pattern or practice of systematically discriminating against Latinos in violation of the Fourteenth Amendment to the

Constitution, Title VI, and the Safe Streets Act. In particular, we find that EHPD engages in discriminatory policing against Latinos, including but not limited to targeting Latinos for discriminatory traffic enforcement, treating Latino drivers more harshly than non-Latino drivers after a traffic stop, and intentionally and woefully failing to design and implement internal systems of control that would identify, track, and prevent such misconduct. The pattern or practice of discriminatory policing that we observed is deeply rooted in the Department's culture and substantially interferes with the ability of EHPD to deliver services to the entire East Haven community.

In addition to the formal finding of discriminatory policing against Latinos, there are two additional areas of serious concern that, while not warranting a formal pattern or practice finding at this juncture, require additional investigation. First, we have serious concerns that EHPD's management practices and accountability systems fail to ensure that individuals are free from unlawful searches and seizures and use of excessive force. Second, we have grave concerns that Department leadership is creating a hostile and intimidating environment for anyone seeking to provide relevant information in our investigation.

Given the longstanding and deeply-rooted nature of the violations outlined in this letter, effective, sustainable resolution will require the development of a comprehensive written agreement along with federal judicial oversight. The remedial measures we outline in this letter will not only assist EHPD to comply with the Constitution and federal law, but will also improve public safety and build community trust and confidence. Effective policing and constitutional policing go hand-in-hand, and the corrective measures outlined in this letter will enable EHPD to ensure that it can fairly and effectively police the entire community.

The Attorney General may initiate a lawsuit pursuant to Section 14141, Title VI, and the Safe Streets Act to ensure compliance with the Constitution and federal law and protect individuals from further unlawful conduct. *See* 42 U.S.C. § 14141(b); 42 U.S.C. § 2000d-1; 42 U.S.C. § 3789d(c)(3). In addition, the United States may suspend or terminate certain federal funding if the Town does not voluntarily address civil rights violations. We seek to avoid either litigation or funds termination by entering into a binding, court enforceable agreement. We will seek to enter into negotiations with the Town in the coming weeks to determine whether a resolution is possible. Regardless of the path forward, we remind you that it is illegal to interfere with or retaliate against any individuals because of their cooperation with a federal investigation.

## I.     Summary of Findings

We conclude that EHPD engages in a pattern or practice of biased policing[1] against Latinos in violation of the Fourteenth Amendment to the United States Constitution and federal

---

[1] "Biased policing" or "biased-based policing" refers to discriminatory enforcement of the law based on categories that include race, color, national origin, gender, religion, age, and sexual orientation. Because it incorporates these categories, it is more broadly applicable than the commonly used term "racial profiling," which may be understood as referring to discriminatory policing based on race alone. Accordingly, we use "racial profiling" in this letter only for consistency with other usage, such as the designation of a policy or a statute, but, in any case, its usage is not limited to race-based discrimination. In addition, the terms "biased policing" and "discriminatory policing" are used interchangeably throughout this letter.

law. Specifically, we have reasonable cause to believe that EHPD officers intentionally target Latinos for disparate traffic enforcement and treatment because of their race, color, or national origin. We based our conclusion on the following:

- a statistical analysis demonstrating that Latino drivers are disproportionally targeted for traffic stops;

- an analysis of traffic stops showing that officers use non-standard and, in some cases, unacceptable, justifications for stops that are not employed against non-Latino drivers, and post-stop treatment that shows EHPD treating Latino drivers more punitively than non-Latino drivers;

- serious incidents of abuse of authority and retaliation against individuals who criticize or complain of EHPD's discriminatory treatment of Latinos;

- a failure to remedy a history of discrimination and a deliberate indifference to the rights of minorities, including EHPD's failure to guide, train, supervise, and discipline officers engaged in unlawful discrimination; and

- significant deviations from standard police practices that result in covering up or exacerbating the disparate treatment of Latino drivers, including:

  o a failure to collect and report traffic stop data in accordance with state racial profiling laws;
  o a failure to implement policies prohibiting discrimination;
  o a failure to hold officers accountable through internal investigations;
  o a failure to provide limited-English proficient Latinos with appropriate language access;
  o a failure to abide by individuals' consular rights; and
  o serious deficiencies in EHPD's management and accountability systems.

These deficiencies and our observations have also caused us to have serious concerns that EHPD engages in unlawful searches and seizures and the use of excessive force. In addition, we are concerned with reports that members of EHPD have created a hostile and intimidating environment for persons who wished to cooperate with our investigation.

## II.     Methodology

On September 30, 2009, we notified East Haven officials that we were opening an investigation of EHPD. We then requested and received documents detailing EHPD organization, policies, and procedures. We also received approximately two years worth of incident reports and data reflecting EHPD's policing activity. Although the Town and EHPD commanders pledged their full cooperation, we encountered resistance from several EHPD officers when we requested interviews and specific documents, even after the Town Attorney had authorized compliance with our requests. We also encountered inordinate delays in the production of electronic data, despite numerous attempts to facilitate production. Most troubling, we received serious allegations that EHPD officers and staff who cooperated with our

investigation were subjected to retaliation and intimidation.  These allegations are consistent with messages that we observed posted on public bulletin boards at EHPD headquarters and other areas of the station house.[2]

In March, April, May, and September 2010, we conducted onsite inspections of EHPD and met with community stakeholders.  Two expert consultants in police practices, both former police executives, accompanied us during two of these tours.  While onsite, we interviewed line police officers and command staff, rode with on-duty patrol officers, interviewed Town officials and community residents, observed EHPD practices, and reviewed pertinent EHPD documents.

Consistent with our commitment to conduct our investigations in a transparent manner and to provide technical assistance where appropriate, we conducted an exit conference with EHPD Chief Leonard Gallo and East Haven officials on April 9, 2010, during which our consultants conveyed their preliminary observations and concerns.  We followed the exit conference with a letter on April 15, 2010, advising East Haven officials of those preliminary concerns.  In that letter, we highlighted six areas of concern:  1) outdated policies and procedures; 2) flaws in reporting and reviewing uses of force; 3) inadequate citizen complaint and internal investigation processes; 4) lack of an early identification or warning system; 5) fragmented community engagement; and 6) limited training.  From April 28 through May 1, 2010, we returned to East Haven with our expert consultants and spoke to community members and other stakeholders regarding their specific experiences with EHPD.  Following our site visits, we obtained extensive documents from the Town, including information received in the fall of 2011, and we have continued to seek information from officials from East Haven and community members.

### III.    Background

#### A.    The Town of East Haven

The Town of East Haven is located along the coast of Connecticut, approximately 68 miles northeast of New York City.  According to the 2010 United States Census, East Haven has a population of 29,257 persons.  The majority of East Haven's residents, 88.5%, are white, and 2.9% of residents are black or African American.  Additionally, Census figures state that 10.3% persons in East Haven identify themselves as Hispanic or Latino.  This represents a substantial growth in the Latino population from the 2000 Census, which identified 4.4% of East Haven residents as Hispanic or Latino.  According to FBI Uniform Crime Report Data, violent crime in East Haven has generally decreased over the same period, and property crimes have remained relatively constant.

#### B.    East Haven Police Department

EHPD employs approximately 50 uniformed officers, only one of whom is fluent in Spanish.  The majority of these officers are divided into three patrol squads:  Squad A covers the 12:00 AM to 8:30 AM shift; Squad B covers the 8:00 AM to 4:30 PM shift; and Squad C covers

---

[2]  On December 2, 2011, we wrote to East Haven Mayor Joseph Maturo requesting information on the Town and Police Commission's efforts to protect individuals from retaliation and intimidation for cooperating with federal investigators.

the 4:00 PM to 12:30 AM shift. There are approximately ten officers assigned to each squad. A lieutenant and two or three sergeants supervise the patrol squads. There is also a unit of detectives. The Chief of Police, appointed by the Mayor of East Haven, commands EHPD. At the commencement of our investigation, Leonard Gallo was the Chief of Police, a role he has occupied for over a decade.

The Mayor annually appoints the Board of Police Commissioners ("Board"), which oversees EHPD. The Board is responsible for, among other things, setting policy and rules of conduct for the Department. The Board's power also includes the authority to appoint and remove EHPD officers and employees. All of the Board's powers are subject to the Town Charter and any applicable collective bargaining agreements.

## IV.    Violations of the Constitution and Federal Law

The practices of the EHPD constitute a pattern or practice of discriminatory policing. Our investigation revealed that Latinos are subjected to disparate treatment, and that the impact on Latinos can only be explained by intentional bias. In reaching this conclusion, we have examined the nature and methods used to conduct traffic stops; departures from standard police practices resulting in disparate treatment; the failure to train, supervise or correct; the failure to collect and review stop data; and the history of biased policing and racial tension in the Town. Our review of the totality of circumstances leads us to find that the conduct of EHPD was motivated, at least in part, by a discriminatory purpose.

### A.    EHPD Engages in a Pattern or Practice of Discriminatory Policing in Violation of the Fourteenth Amendment

EHPD officers engage in a pattern or practice of discrimination against Latinos in violation of the Equal Protection Clause of the Fourteenth Amendment that is actionable under Section 14141. Section 14141 provides that "[i]t shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[3]   42 U.S.C. § 14141(a). The Equal Protection Clause prohibits governmental conduct that would "deny any person . . . equal protection of the laws." U.S. Const. amend. XIV § 1.

A violation of the Equal Protection Clause by a police agency requires proof that the agency acted with discriminatory intent or purpose.[4]   *Vill. of Arlington Heights v. Metro. Hous.*

---

[3]   The touchstone of a "pattern or practice" is generally the degree of regularity or routine of the action in question. In interpreting parallel language in Title VII of the Civil Rights Act of 1964, the Supreme Court held that a "pattern or practice [is] present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) (internal quotation marks omitted). In discrimination cases, statistical evidence and anecdotal evidence can together show a "pattern or practice" under this definition. *Id.* at 338-39.

[4]   Among the classes of persons protected by the Equal Protection clause are those having a common foreign ancestry. *Hernandez v. Texas*, 347 U.S. 475 (1954). Importantly, undocumented persons within the United States are entitled to equal protection of the law. *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (rejecting the argument that "undocumented aliens, because of their immigration status . . . have no right to the equal protection of Texas law.").

*Dev. Corp.*, 429 U.S. 252, 265 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). A jurisdiction's discriminatory action need not be based solely or even dominantly on a discriminatory intent or purpose, but instead need only be "a motivating factor" in the action in question. *Arlington Heights*, 429 U.S. at 265-66. In some cases, the discriminatory impact alone can also show discriminatory intent as "a clear pattern, unexplainable on grounds other than race." *Id.* at 266; *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (noting that discriminatory purpose may be inferred from impact of the disputed practice on one racial group).

In addition to the discriminatory impact of an action, discriminatory purpose may be inferred from "the totality of relevant evidence." *Davis*, 426 U.S. at 242. Indeed, the Supreme Court has identified numerous sources of evidence that may show discriminatory intent, such as the historical background of the challenged course of action, specific events leading up to the challenged course of action, and departures from the standard procedures that would normally guide the action in question. *Arlington Heights,* 429 U.S. at 266-67.

Accordingly, our finding that EHPD officers have engaged in discriminatory policing against Latinos is based on the following: 1) EHPD targets Latinos for discriminatory traffic enforcement and treatment; 2) EHPD abuses its authority by retaliating against individuals who criticize or complain of EHPD's discriminatory conduct; 3) EHPD fails to take corrective action following judicial findings of discriminatory customs and practices within EHPD, including a deliberate indifference to the rights of minorities in East Haven; and 4) EHPD willfully disregards basic and common procedures used by police agencies and mandated by state law to prevent biased policing. Our evidence therefore shows that EHPD singles out Latinos for discriminatory treatment.

### 1.    EHPD Intentionally Targets Latinos for Disparate Traffic Enforcement and Treatment

Our statistical analysis of EHPD's traffic stop data shows that Latinos experience vastly disparate treatment on East Haven roads compared to non-Latino motorists. The size of this disproportion illustrates the degree to which EHPD suffers from significant institutional deficiencies. A law enforcement agency with adequate systems of oversight and accountability would have discovered this problem and rapidly corrected it, rather than permitting it to continue unabated for years.

EHPD provided us with all records pertaining to traffic stops for a two-year period, from January 1, 2009, through December 31, 2010. We analyzed this data to determine whether EHPD officers as a whole stopped Latinos at a disproportionate rate and to determine whether individual EHPD squads or particular officers were stopping Latinos at a disproportionate rate.

Although our analysis showed significant disproportion on every level of EHPD traffic stop activity—by the entire department, by independent squads, and by individual officers—the most striking disproportion was on the squad and officer level. In analyzing squad activity and officer activity, we compared the traffic stop activity of each squad against other squads, and of individual officers against other officers. This kind of peer-based comparison is particularly useful in identifying problematic units and officers. Despite the ready availability of EHPD

traffic stop data, EHPD failed to perform this analysis on its own, permitting obvious disproportionate behavior to continue without any corrective action.

At the squad level, we found that Squad C, which covers the 4:00 PM to 12:30 AM shift, stopped the highest proportion of Latinos[5] during motor vehicle stops of all squads, at 24.8%. While this figure does not account for individual differences among officers in Squad C, the deviation in stops of the squad as a whole is highly statistically significant as compared to the other squads and should have caused EHPD to immediately investigate Squad C and its traffic stop activity.  With respect to the remaining squads, Latinos comprised 17.8% of motorists stopped by Squad A and 14.7% of motorists stopped by Squad B.

We similarly found some EHPD officers with massive disparities in their stops of Latinos as compared to other officers in EHPD.  Indeed, one officer had a stop rate of Latinos of 40.5%, an extraordinary deviation from the baseline of other EHPD officer activity.  EHPD accordingly permitted officers with stops rates of Latinos that approached one in two or one in three to operate without oversight or discipline, strong evidence that EHPD at the very least enabled their discriminatory conduct.

Finally, we analyzed the stop activity of EHPD as a whole.  Because there is no internal benchmark against which to compare the activities of an entire department, we used the Latino population of East Haven and all of its surrounding towns, adjusted to capture only Latinos old enough to drive, to approximate the probable number of Latinos driving in East Haven at any given time.  When taking all officer activity into account, including those officers who rarely stopped Latinos, we found that over 19.9% of all traffic stops were still of Latinos.  This rate is greater to a statistically significant degree than the 15.5% of Latino drivers we approximated to be in East Haven and surrounding towns.  The disparity is even greater if only East Haven is taken into account, which is 8.3% Latino drivers, or East Haven and contiguous census tracts, which is 11.1% Latino drivers.

The aforementioned statistical evidence shows pervasive discrimination against Latinos on every level of EHPD traffic enforcement activity.  The discriminatory traffic stops by squads and officers in EHPD is particularly problematic:  not only did we find high rates of disproportionate stops by squads and officers, but such obvious conduct was ignored by EHPD, and not corrected.  The breadth of the discriminatory actions, as well as the discriminatory impact of these actions, constitutes strong evidence of discriminatory intent.  *See Arlington Heights*, 429 U.S. at 266.

We relied on much more than impact alone to reach our findings.  We found evidence of broadly-used tactics used by EHPD officers to target Latinos.  The discriminatory effect of a police agency's actions is a critical component of an equal protection violation, *see Arlington Heights*, 429 U.S. at 265-66, and statistics and the facts and circumstances surrounding the statistics are common ways to demonstrate discriminatory effect.  *Teamsters*, 431 U.S. at 339-40. The widespread nature of this conduct is sufficient to constitute a pattern or practice of discrimination.  *See Ottaviani v. State Univ. of New York*, 875 F.2d 365, 371 (2d Cir. 1989).

---

[5]  Latinos were identified through EHPD determinations and the generally accepted method of surname analysis.

a)   EHPD relies on non-standard and unacceptable methods to justify
its disparate treatment of Latinos during traffic stops

We analyzed approximately 1,000 incident reports generated by the EHPD squad tasked with the evening shift, where traffic enforcement activity is generally at its highest. The incident reports demonstrate that EHPD officers: 1) focus their traffic enforcement activity on areas where Latinos congregate; 2) use non-standard, and, in some cases, unacceptable, methods to generate reasons for stopping Latino drivers that are not employed for non-Latino drivers, and 3) treat Latino drivers more punitively than non-Latino drivers after traffic stops.

During our investigation, we received numerous reports that EHPD officers target Latino places of business by focusing their traffic enforcement activity on customers leaving those businesses. Consistent with these reports, we found that EHPD officers also target specific areas of Frontage and Foxon Roads for their traffic enforcement activity: areas where Latinos are known to congregate. Based on the EHPD incident reports, we found that EHPD officers deliberately choose these locations to wait in their patrol cars for Latino drivers to pass so that they can initiate traffic stops on these vehicles, a tactic known in law enforcement as "sandbagging."

That certain EHPD officers are specifically targeting Latino drivers is demonstrated by the extreme tactics they employ to justify these traffic stops. Once these EHPD officers target a Latino driver for a traffic stop, they employ a variety of methods to find cause to initiate the traffic stop, methods they typically do not employ on non-Latino drivers. With Latino drivers, the incident reports show that EHPD officers will first attempt to identify a facial defect on the license plate of the car. If there is no obvious defect, and the car has an out-of-state license plate, the officers will stop the car based on claims that, in their experience, such out-of-state plates are often forged. On other occasions, the officers will follow the Latino driver and wait for a traffic violation to occur that they can cite, a tactic rarely used against non-Latino drivers. In other instances, the officers cite speeding as the justification for a stop, but, contrary to standard police practice, give no indication of how they know a car is speeding, failing to state that they paced the vehicle or used a radar gun. In at least one case, the officer took the highly unusual step of looking up the insurance information for a moving vehicle in order to find cause for the stop, demonstrating the degree to which legitimate traffic enforcement is a secondary consideration to targeting Latino drivers. Indeed, the regularity of these tactics, their deviation from standard police practice, and their unequal application to Latino drivers all demonstrate that EHPD officers in this squad are not engaged in legitimate traffic enforcement but are instead targeting Latino drivers.

While pretextual stops of motorists may be lawful in the ordinary case, they violate due process and equal protection if motivated by an improper purpose, including bias. *See Whren v. United States*, 517 U.S. 806 (1996). This is especially true under circumstances where there is a pattern of behavior by police officers that result in a disparate impact. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 45-46 (2000) ("while '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis,' . . . programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion. Accordingly, *Whren* does not preclude an inquiry into programmatic purpose in such contexts.").

The incident reports further reveal a pattern of discriminatory treatment following the stop. After a traffic stop is initiated, we found that some EHPD officers subject Latino drivers to much harsher treatment than non-Latino drivers. In particular, these EHPD officers will typically arrest Latino drivers and have their vehicles towed. Consequently, Latinos stopped by these officers not only lose the use of their vehicles, but they are required to post a surety bond in order to be released. In contrast, the same EHPD officers typically treat non-Latino drivers in a less punitive fashion, often releasing them from the scene after giving them a written notice to appear in court. These drivers generally do not have their vehicles towed. EHPD's towing policy is ambiguous, and appears to permit officers to make discretionary decisions regarding towing that have been used to discriminate against Latinos. Moreover, the supervisors responsible for reviewing these reports have failed to question or correct this behavior.

EHPD's use of tactics that are directed almost entirely at Latinos demonstrates the degree to which Latinos are disparately impacted by EHPD practices. Indeed, the use of these discriminatory tactics is so pervasive as to independently show that they were taken with the intent to target Latinos in violation of the Fourteenth Amendment. *See Arlington Heights*, 429 U.S. at 266.

b) EHPD utilizes haphazard and uncoordinated immigration enforcement to target Latinos

EHPD's program for enforcing immigration laws is haphazard and departs from professional police practices. Departures from standard procedures that result in a disparate impact are evidence of intentional bias. *See Arlington Heights*, 429 U.S. at 267.

EHPD does not have an agreement with the U.S. Department of Homeland Security's Immigration and Customs Enforcement ("ICE") delegating immigration enforcement authority to any EHPD officer. These agreements, commonly referred to as "287(g) agreements," permit designated and trained local law enforcement officers to perform immigration enforcement functions under the supervision of ICE officers. Nonetheless, EHPD has allowed its officers to engage in haphazard and uncoordinated immigration enforcement efforts to target Latino drivers for traffic stops. EHPD command staff informed us that they have authorized officers to conduct immigration investigations if they make a felony arrest or if a detained individual provides a foreign passport. Although EHPD immigration investigations regularly occur, this authorization does not exist as a formal policy within EHPD, and it is not consistently enforced or adequately reviewed. As a result, EHPD officers conduct immigration investigations well outside even the limits EHPD identified. We reviewed numerous incident reports where EHPD officers contacted ICE to ascertain immigration status or seek an immigration hold on Latinos. In all of these incidents, the arrests were for traffic infractions, rather than felonies, but EHPD officers requested that ICE issue an immigration detainer. EHPD officers' divergences from even the minimally restrictive immigration enforcement policy adopted by EHPD—and the failure of EHPD to correct these divergences or manage the enforcement of immigration law more generally—demonstrates that EHPD practices in this respect are not directed at legitimate local enforcement of immigration law in cooperation with the federal government.[6] Instead, given

---

[6] Indeed, ICE had previously made clear that it did not intend even for the local agencies formally involved in its official immigration enforcement program to make regular use of traffic enforcement to exercise their immigration

EHPD's history of discrimination, these gaps in policy constitute a means for EHPD officers to harass and intimidate the Latino community.

EHPD's haphazard local enforcement of immigration law, conducted without the guidance of the federal government or training from EHPD on constitutional policing, has negative implications for the relationship between a local law enforcement agency and the impacted minority communities it serves. For that reason, local law enforcement agencies seeking to enforce immigration law without diminishing their ability to adequately serve these communities make use of procedures to ensure transparency and accountability in enforcement, including acting cooperatively with the federal government.[7] These law enforcement agencies also often conduct outreach to describe their policies relating to the enforcement of immigration law, including when such investigations of immigration status are authorized. Communication of this nature is necessary to preserve the ability of the police to make contact with witnesses and victims, who will often refuse to come forward for fear of personal consequences or consequences for friends or family. We found that EHPD's enforcement of immigration law, conducted as it is without conformity with federal priorities or guidance, training, oversight by EHPD command staff, and consistent application, lacks all of these protections and is instead used to harass and intimidate Latinos rather than pursue legitimate law enforcement objectives.

## 2.   EHPD Retaliates Against Individuals who Criticize or Complain of Disparate Treatment of Latinos

EHPD perpetuates a culture of fear and intimidation in East Haven by retaliating against individuals who criticize or complain of EHPD's disparate treatment of Latinos. A pattern of hostility towards a discrete community, such as that found here, serves as important evidence of discriminatory conduct. *See Arlington Heights*, 429 U.S. at 265-66; *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 548-49 (S.D.N.Y. 2006) (examining *Arlington Heights* factors and finding that, taken together, the factors showed that an anti-day laborer campaign was motivated by racial animus and targeted Latino day laborers). We interviewed community members who recounted first hand incidents of abusive and retaliatory behavior. The following incident is one of many that illustrate retaliatory conduct by police officers:

> Following complaints from individuals in East Haven about discriminatory treatment by EHPD, a local priest began documenting EHPD activity directed at Latinos. As a result, the priest became the target of intimidation and harassment by EHPD. For instance, in March 2009, EHPD officers entered a Latino-owned business and accused the owner of attempting to sell license plates, an allegation apparently based solely on the approximately 80 license plates the business owner had decorating a store wall. The owner denied that the plates were other than decorative, but two EHPD officers then initiated a criminal investigation of this activity, which, at most, would culminate in a minor infraction of State

authority. *See* United States Department of Homeland Security, Fact Sheet, Delegation of Immigration Authority; Section 287(g) Immigration and Nationality Act (2007) (on file).

[7] The parameters of such cooperation may be found in United States Department of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters (2011), *available at* http://www.dhs.gov/xlibrary/assets/guidance-state-local-assistance-immigration-enforcement.pdf.

registration laws if it comprised a violation at all. The priest began videotaping the officers' activities in the store. Upon seeing that they were being videotaped, the officers demanded that the priest stop recording. When the priest refused, the EHPD officers used force against him and ultimately arrested him. The arresting officer falsely reported that he did not know that the priest was holding a video recorder, and falsely reported that he thought the priest was instead holding a weapon, necessitating the use of force and subsequent arrest. In a videotape of the incident that we reviewed, the officers can clearly be heard acknowledging that the priest was carrying a video recorder. Based on our investigation, EHPD command staff conducted no meaningful investigation of the incident in question, and meted out no discipline, despite agreeing that the incident took place as the videotape showed.

The unusual and highly aggressive actions taken by the EHPD officers in this case, coupled with the officers' dishonesty and the failure of EHPD to correct or discipline, illustrate the culture of hostility towards the Latino community and a tolerance for retaliation.

### 3.    EHPD Has Failed to Remedy a History of Discrimination

Our investigation found that East Haven has an extensive history of past discrimination that it has failed to meaningfully address or remedy. This historical background serves as evidence of discriminatory purpose, especially if "it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

East Haven and EHPD have been the subject of litigation for a decade in which EHPD officers were accused of discriminatory conduct towards African Americans. This litigation ended with a jury verdict against East Haven. The federal court concluded in 2007 that sufficient evidence was presented at trial for a jury to find that "there existed within the EHPD a custom or practice of deliberate indifference to the constitutional rights of African-Americans, [and] that the Chief of Police was aware of the custom or practice and deliberately indifferent to it." *Jones v. Town of East Haven, et al.*, 493 F. Supp. 2d 302, 338 (D. Conn. 2007).

EHPD's singling out of the African-American community for a series of discriminatory actions is a serious matter and the lingering effects of the discrimination may be evidence of discriminatory intent in the treatment of other minorities. *See Rogers v. Lodge*, 458 U.S. 613, 626 (1982) (noting past discriminatory actions may serve as evidence of current discriminatory practices) and *Abramson v. American University*, No. 86-1413, 1988 WL 152020, at *1 (D.D.C. June 13, 1988) (holding that evidence of an employer's prior discrimination against other minority groups is "relevant towards the issue of his discriminatory intent in general."); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) (noting relevance of general minority hiring practices as evidence in claim of employment discrimination brought by black employee).

Moreover, our investigation uncovered no evidence that EHPD instituted any meaningful changes in any of its policies following the *Jones* verdict. Indeed, officers directly involved in the incidents giving rise to the *Jones* verdict remain with EHPD and have been, in some cases, promoted to supervisory roles. We found no evidence that they were subject to meaningful discipline or retraining as a consequence of their roles in the *Jones* incidents. Retention of

persons in places of authority—and with no apparent disciplinary or responsive policy modifications—is strongly probative of discriminatory intent on the part of EHPD. *See United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) (noting that "patterns of official appointments that fill key positions with persons who are likely to maintain a segregated status quo" is probative of discriminatory intent).

### 4.   EHPD's Targeting of Latinos Arises from a Willful Failure to Prevent Discrimination in its Institutional Practices

EHPD substantially departs from conventional practices used by law enforcement agencies designed to prevent bias-based policing. *See Arlington Heights*, 429 U.S. at 267 (noting that departures by an official or a government body from standard practices in the conventional application of a law or procedure can point to a discriminatory purpose when those departures enable or cause discriminatory conduct). Even-handed enforcement of the law in conventional police agencies has numerous generally-accepted critical components: Officers 1) must be adequately trained on the constitutional enforcement of the law; 2) must be guided by detailed policies and codes of conduct; and 3) must be subject to a system of accountability, which includes meaningful recordkeeping, supervision, internal investigations, and oversight. The systematic and serious departures of EHPD from each of these principles of effective law enforcement are evidence that EHPD does not engage in even-handed enforcement, and instead promotes or condones discriminatory application of the law.

> a)   EHPD does not comply with state laws designed to prevent racial profiling

Law enforcement agencies in Connecticut are required by State law to document all traffic stops, including demographic information, and report this information to a State body. *See* Conn. Gen. Stat. § 54-1m (2010). This statute, one of the first of its kind in the nation, is specifically designed to prevent racial profiling by Connecticut law enforcement agencies. *See id.* On March 7, 2009, the press made public EHPD's failure to have ever fully complied with this statute. During the course of our investigation, we confirmed with EHPD command staff that this failure had not been remedied. Although EHPD possesses sophisticated data terminals capable of recording the required information, EHPD has never meaningfully reviewed the data it collects, nor has it turned it over to the State as required by the statute. EHPD's failure to audit the data also places it out of compliance with the State statute. Our own review of the data showed that a large number of entries reflecting traffic stops were devoid of ethnicity data or appeared to misreport ethnicity data. Because EHPD failed to audit its own data, it could not comply with the statute's requirement to accurately report such data.

EHPD's failure to comply with a state statute designed to prevent biased policing is evidence that EHPD command staff sought to obscure the unlawful activities of EHPD officers.

> b)   EHPD does not maintain policies preventing biased policing

EHPD policies and procedures regarding bias are flawed and reflect deliberate indifference to protecting the rights of Latinos in its community. EHPD command staff are aware of those flaws and did not make the necessary corrections.

EHPD only promulgated a policy addressing biased policing after 2009. The policy came after EHPD was found to be out of compliance with the State racial profiling statute and had been subjected to a series of allegations of racial profiling. The haste with which the policy was issued is evident in its contradictory and superficial definitions of racial profiling. For instance, the policy states that EHPD will not engage in enforcement activity "when such activity is motivated by race, color, ethnicity, age, gender, or sexual orientation." But the policy then goes on to define racial profiling as enforcement activity taken "solely on the basis of racial status of . . . a person." By use of the word "solely," EHPD at best injects ambiguity into whether an EHPD officer may take race into account when conducting a traffic stop and at worst tells officers that they can use race as a reason to conduct a traffic stop as long as they have (or create) at least one other reason.

We identified other policy deficiencies that are connected to EHPD's failure to address biased policing. EHPD has put in place no policies to help its officers communicate with Spanish-speaking members of the community, thereby preventing EHPD officers from building relationships that can enhance officer safety and depriving a significant portion of the Latino community of policing services. Nor does EHPD have formal policies addressing enforcement of immigration law, or the appropriate tactics that may be used in conducting a traffic stop, such as requiring the means that an officer used to develop probable cause for the stop to be recorded.

### c)   EHPD does not train officers to avoid biased policing

Outside of training offered at the statewide Peace Officer Standards and Training Academy ("POST"), we found that EHPD offers its officers minimal training in policing, and virtually no training on matters related to bias-based policing. Reliance only on academy training in this area—which is characterized by evolving standards and practices among police agencies—is a significant departure from generally accepted police practices. Such reliance gives officers recourse only to static and dated training that does not address changes in law or the many different circumstances that an officer may encounter beyond those contemplated or capable of being addressed in an academy-level course. Moreover, EHPD officers receive no training in the topics that are necessary supplements to avoiding biased policing, including diversity training or cultural sensitivity training. These failures are particularly egregious in light of recent discrimination-related civilian complaints, media reports, and litigation, as well as the finding of discrimination by EHPD officers in *Jones*.

### d)   EHPD does not hold officers accountable for biased policing

#### (1)   *EHPD hinders the ability of Latinos to file complaints*

A functional, accessible complaint system is critical in maintaining accountability in a law enforcement agency and in ensuring a close working relationship with communities that the agency serves. EHPD operates a seriously deficient system for acting upon complaints submitted by community members. Based on our review of EHPD documents and observations during our tour, this complaint system is designed in a way that discourages community participation and especially participation by the Latino community.

In April 2010, during our onsite investigation, EHPD had a highly limited procedure for accepting complaints. A complaint system that comports with generally accepted law

enforcement practices should be designed to accept complaints from a variety of sources with minimal barriers to the submission of a complaint. EHPD had, in contrast, adopted a number of practices known to limit the complaints that a police agency receives. EHPD complaint forms were available only at EHPD headquarters, deterring persons who might fear contact with the police from ever filing a complaint, since such a complaint would necessitate travelling to the office and asking the on-duty officer for a complaint form. Similarly, the complaint forms contained bolded and repeated admonitions regarding criminal liability for making false statements to police officers, again a well-known deterrent to filing a complaint. Moreover, the complaint process in place at that time required that statements be notarized by a police officer and notarization requires the complainant to produce certain specified forms of identification.

It is of great significance that, during the time period of our investigation, the required form was available only in English. Had a Latino person with limited English proficiency come to the station house, the only available complaint form was useless. The failure to provide accessible complaint forms to Latinos was even more egregious in light of the tensions that have existed between EHPD and the Latino community, and EHPD's awareness of those tensions.

The complaint system in place at the time of our onsite investigation was a concern that we highlighted in our April 15, 2010, post-tour letter. Subsequently, EHPD substantially changed its complaint process and the complaint form itself. EHPD now makes a printable version of the complaint form available on its website in English and in Spanish. EHPD has also lifted the notarization requirement and removed admonitions about criminal liability. Still, the previous complaint process, and the fact that reform only came at the behest of the United States, provides important context for the discrimination that occurred while it was in place and the culture of bias that remains.

(2)     EHPD limits the initiation, scope, and resulting discipline of internal investigations

An independent system for conducting internal investigations is vital to a law enforcement agency's ability to meaningfully supervise its officers. The failure to have an internal review process, particularly in the face of repeated and serious complaints of biased policing—most notably a federal court judgment and a federal civil rights investigation—is evidence of intent.

EHPD's internal investigation process deviates widely from generally accepted police practices, enabling officers that have the sympathy of EHPD command staff to act with impunity. This is particularly significant in the circumstances here, where we have identified certain officers who target Latinos. That EHPD lacks the primary system that would allow it to identify and remedy individual officer misconduct substantially enables officer misconduct.

Generally accepted police practices require internal investigations to be objective and done in a way that ensures that the investigator initiates and concludes the investigation in a consistent manner. Based on our investigation, EHPD's internal investigations do not function according to acceptable practices. EHPD has failed to establish procedures indicating the types of complaints of misconduct that will immediately cause an internal investigation, nor has it set meaningful standards guiding that investigation. Instead, internal investigations are initiated at

the behest of the EHPD Chief, who exercises sole decision-making authority over when investigations occur.

A review of complaints of officer misconduct shows that the absence of clear standards for initiating investigations has resulted in arbitrary decisions to ignore serious complaints of misconduct. For example, approximately two years ago, EHPD was made aware of a number of complaints against individual officers and the department as a whole involving unlawful stops and discriminatory policing. Rather than engage in an independent internal review, the EHPD Chief undertook the investigation himself and informally determined that the complaints of individual misconduct were unsubstantiated. We found that this incident was part of a larger pattern of informal resolution of serious complaints without independent review done through routine internal investigation procedures.

Further, in another departure from generally accepted policing practices, we found that EHPD procedures or practices do not require findings to be issued, nor do they require the investigation to be conducted in a thorough manner. For example, in an investigation involving allegations of serious misconduct by an officer while on duty, the investigation appears to have been closed when the complainants could not be reached. The internal investigation file contained no statement from the officer, despite the seriousness of the allegations. The reports reflecting the investigations are also insufficient because they do not cite any particular rule or policy that the target of the complaint has broken, nor is there any system in place for designating the findings of an investigation.

Many of the reports further do not make formal determinations or the findings do not comport with the facts. For one complaint, the investigation found that the misconduct had occurred, but the complaint was ultimately dismissed as "unsustained," a finding defined by EHPD policy as meaning there was "[n]ot enough evidence to prove or disprove the allegation." But the grounds for the dismissal were simply the officer's work record and amenability to future improvement, neither of which bear on whether he committed the conduct in question.

The broken system for handling officer misconduct within EHPD permits officers to target Latinos with little fear of consequences. Investigations that are completed are superficial, permitting arbitrary decisions giving rise to an inference that officers may engage in misconduct so long as it is supported by the relevant EHPD command staff. Indeed, EHPD officers we spoke to reported precisely this kind of favoritism.

e)     EHPD exercises minimal oversight of its officers

Our investigation identified no systematic means by which EHPD monitors officer activity. EHPD has no system to track and analyze complaints, incidents in which an officer has used force, or any other policing activity that would allow its command staff to determine whether an officer has engaged in discriminatory policing. Notably, the absence of such a system is damaging to the officer as well as to EHPD and the broader community: such systems are used regularly by policing agencies as a means to intervene in response to officer misconduct or potential misconduct before the officer has put him or herself or members of the community at risk of harm. Without such a system, EHPD lacks the ability to accurately respond to accusations of biased policing because EHPD command staff does not collect the data or conduct the analysis necessary to refute such claims.

Additionally, EHPD provided us with documents detailing the command staff positions responsible for ensuring officer compliance with policy and codes of conduct. Our investigation found that three of these critical positions were vacant for a significant period. Thus, while EHPD appears to rely on command staff awareness in place of, rather than in addition to, a system of analyzing officer misconduct, it does not have even this minimal level of supervision in place to exercise adequate control over the agency.

f)    EHPD has refused to provide meaningful language access to Latinos

The growth of the Latino population in East Haven has increased the presence of persons whose primary language is Spanish. EHPD, as a recipient of federal funds, is obliged under Title VI to provide language services to persons with limited English proficiency and has been on notice of that obligation since well before the initiation of this investigation.[8] Despite EHPD's awareness of this obligation, our investigation found that EHPD has made scant effort to provide Spanish language assistance to persons with whom EHPD officers come into contact. EHPD has failed to utilize a language line[9] for communication with persons that are not proficient in English and has no formal policies guiding EHPD officers in the field for their encounters with such persons.

The failure to provide services in Spanish is an independent legal obligation under Title VI and the accompanying regulations, as well as evidence of intentional bias. Moreover, the failure to serve all parts of the community limits the ability of EHPD to provide for public safety throughout the Town. Unless they can communicate, officers cannot adequately conduct investigations of crimes through questioning of victims and witnesses, explain the reasons behind a traffic stop, or communicate various rights guaranteed by the Constitution and federal law. Procedures for language assistance are therefore a critical element of effectively and lawfully policing a diverse jurisdiction.

g)    EHPD has disregarded the consular rights of Latinos

EHPD's disregard for the rights of Latinos in East Haven includes failure to abide by treaties entered into by the United States obligating law enforcement agencies nationwide to notify arrested foreign nationals of their right to contact their respective consulates. Our investigation found that EHPD regularly comes into contact with Latinos who are nationals of other countries. In these circumstances, depending on the nationality of the person involved, EHPD must either contact the appropriate consulate and notify the consulate of the arrest, or notify the arrestee that the arrestee has the right to make such contact. But we found that EHPD has entirely failed to understand or protect these clearly-defined rights. Despite EHPD command staff's awareness of the numerous Latinos of foreign nationality that live in and travel through its jurisdiction, EHPD has adopted no training or policies assuring that their consular notification rights will be respected.

---

[8] Executive Order 13,166, 65 Fed. Reg. 50,121 (Aug. 11, 2000); Dep't of Justice, *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455 (June 18, 2002).

[9] A language line is a telephone-based interpretation service available immediately and 24 hours a day.

h) EHPD has refused to meaningfully engage with the Latino
community, despite the Latino community's growth

Our investigation found that, contrary to contemporary policing practices, EHPD has
made almost no attempt to conduct meaningful outreach to the Latino community.  Police
agencies typically engage in outreach to the communities they serve in order to gain that
community's trust, make the community aware of policing efforts being conducted in that
community, and establish lines of communication that will aid the law enforcement objectives of
the agency.  Engagement with the community also enhances officer safety through familiarity
with the community and its members.  In contrast to this standard practice, we found little or no
evidence that EHPD officers or command staff have made any serious attempt to engage with the
Latino community through any community outreach efforts.  Again, such efforts are necessary to
ensure that EHPD is adequately engaged with all the communities it is required to police and has
the trust and legitimacy necessary to be able to effectively serve victims and utilize witnesses in
the Latino community.  During our investigation, we encountered Latinos who described being
reluctant to seek police assistance out of distrust and fear of EHPD officers.  EHPD's failure to
engage with the Latino community has therefore had the foreseeable consequence of limiting the
degree to which Latinos in East Haven receive police services.

i) An audit commissioned by the Town of East Haven also found that
EHPD suffers from significant institutional deficiencies

Our findings regarding EHPD's management failures and deficiencies were echoed in a
report issued to EHPD by the Police Executive Research Forum ("PERF") in March 2011.[10]  The
Town of East Haven contracted with PERF to conduct an operational audit of EHPD, which
included:  reviewing the management and organizational structure; examining the effectiveness
of EHPD's managerial responsibilities of planning, direction, and controlling; assessing current
department and community interactions; examining staffing levels; and reviewing and assessing
infrastructure.  Although PERF functioned only as consultant to Town officials, and made its
findings accordingly, its report nevertheless sheds useful light on the institutional dysfunctions
we describe above.

The PERF Report found that EHPD policies "fell well short of best professional
practices," including policies regarding use of force, less lethal weapons, civilian complaints and
internal investigations, and an early intervention system.[11]  The PERF report emphasized that
"many of the current policy directives are outdated" and encouraged EHPD to take action to
update them.[12]  During the course of the audit, PERF learned that some EHPD officers ignored
the policies that existed.  This problem of officers disregarding policies was further complicated
by EHPD's "uneven enforcement of policy infractions and inconsistent application of
discipline."[13]

---

[10] Police Executive Research Forum, Operational Audit of the East Haven Police Department: Final Report (2011)
("PERF Report").

[11] *Id.* at 7.

[12] *Id.* at 43.

[13] *Id.* at 6.

Additionally, the PERF Report noted that EHPD failed to fund training for its officers in the years immediately preceding the audit. It concluded that lack of reinforcement from training leaves the officers, the public, and the Town at greater risk. Also, after reviewing EHPD's existing policy for capturing and recording racial profiling data, the auditors found it necessary to develop a Model Racial Profiling Policy for EHPD. Along similar lines, the audit emphasized the need for EHPD officers to "provide the same level of service to all those who live, work, and drive in East Haven."[14] The PERF Report highlighted that EHPD should work to improve relationships with all of the Town's communities, but placed a particular emphasis on the Latino community.

PERF's findings regarding insufficient policies and procedures, training, discipline, and community engagement support our conclusion that EHPD institutional practices facilitated the pattern and practice of discrimination against Latinos. Indeed, PERF found many of the same failures that we have described above, indicating that EHPD's serious deficiencies are readily and widely observable. EHPD has nevertheless responded to PERF's recommendations in a limited manner—of the fifteen specific new policies recommended by PERF, EHPD has informed us of only three new policies and procedures promulgated during our investigation.[15]

## B.    EHPD Violates Title VI and the Safe Streets Act by Engaging in Discriminatory Practices Against Latinos

The actions and willful inactions discussed above constitute a violation of Title VI and the Safe Streets Act. However, the United States is deferring formal determinations of noncompliance with Title VI and the Safe Streets Act at this time to provide you an opportunity to voluntarily cooperate in resolving this matter so that your federal funding from the Department of Justice is no longer at risk. Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance and authorizes the United States to seek judicial remedy for failure to voluntarily comply with those prohibitions. *See* 42 U.S.C. §§ 2000d, 2000d-1(2). Similar to the Equal Protection Clause, Title VI prohibits intentional discrimination. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (noting that violations of Equal Protection clause are violations of Title VI). Further, the Department of Justice, like other federal agencies, has adopted regulations implementing Title VI that prohibit practices that have the effect of discrimination on the basis of race, color, or national origin. *See, e.g.*, 28 C.F.R. § 42.104(b)(2) (prohibiting "methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin"). A jurisdiction receiving federal financial assistance can accordingly be found in violation of Title VI when its procedures or practices have a disparate impact on individuals of a particular race, color, or national origin, and such practice lacks a "substantial legitimate justification." *New York Urban League v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995).

The Safe Streets Act prohibits discrimination on the basis of race, color, religion, national origin, or sex by police departments receiving certain federal funds. The United States is

---

[14] *Id.* at 42.

[15] The three new policies are Administrative Orders for a Code of Conduct, a Code of Ethics, and an Internal Affairs Complaint and Discipline Policy. It is not clear whether these orders have been formally activated within EHPD as they did not include issue dates.

authorized to bring a civil action in an appropriate United States district court to address a pattern or practice of discrimination by any state or local criminal justice agency receiving such federal funds. The Safe Streets Act has been interpreted by both case law and regulation to prohibit government activity having a discriminatory impact. *See United States v. Commonwealth of Virginia*, 454 F. Supp. 1077 (E.D. Va. 1978); *United States v. City of Miami*, 614 F.2d 1322, 1328-29 (5th Cir. 1980); 28 C.F.R. § 42.203(e).

The pattern or practice of bias described above, including EHPD's targeting of Latinos, particularly in traffic enforcement, the pattern of hostility towards the Latino community, and numerous institutional practices enabling discrimination, supports finding independent violations of Title VI and the Safe Streets Act.

We have identified qualifying funds under both statutes received by East Haven and EHPD from the DOJ's Office of Justice Programs. In addition, EHPD has received qualifying federal funding through its participation in the DOJ's Equitable Sharing program. As a federal fund recipient, EHPD signed assurances agreeing to abide by federal law prohibiting discrimination. EPHD certified, in part, that it "is in compliance with the nondiscrimination requirements of [Title VI] and [its] Department of Justice implementing regulations."

## V.   Additional Areas of Serious Concern

In addition to the violations of the Constitution and federal law outlined above, there are two additional areas of serious concern where, at the moment, we do not make a formal pattern or practice finding, but our review continues. First, our investigation revealed serious deficiencies in the accountability and supervision of officers that creates an unreasonable risk of other constitutional violations. In particular, we found serious institutional deficiencies in EHPD's management and accountability systems, as outlined in our April 15, 2010, letter, that fail to protect individuals from unlawful searches and seizures and use of excessive force. (Letter attached as Exhibit A). We are continuing to review this issue.

Second, we are also concerned with reports that Chief Gallo and other EHPD officers created a hostile and intimidating environment for persons who wished to cooperate with our investigation at EHPD. During our tours, we observed notes that were publicly displayed outside individual offices referencing our investigation in a disparaging manner and messages on a police union bulletin board that referred to "rats" at EHPD. We also learned that Chief Gallo had warned staff that DOJ had agreed to provide him with the names of individuals who cooperated with the investigation, contradicting our discussions with Chief Gallo. Indeed, prior to this incident we notified Chief Gallo that we would keep the names of officers or staff who spoke to us during our investigation confidential in order to protect individuals from potential retaliation. The hostility we observed was also directed at civilian members of the Police Commission. For example, during one of our tours, officers referred to EHPD headquarters as a "poisoned pond" when a Police Commissioner entered the building for a scheduled interview with us. The Police Commissioner became visibly upset and agitated at the officers' comments and canceled the interview.

Remarkably, DOJ staff members were also the object of similar questionable conduct by several officers and union representatives who met with us prior to our first on-site tour of EHPD. At a late evening meeting, officers warned DOJ staff and a police practices consultant

that that they could not guarantee their safety during ride-alongs with officers, a highly unusual statement given the nature of our ride-alongs and the relatively low violent crime rate in East Haven. We continued to receive subsequent reports of hostility and intimidation by EHPD officers and police union representatives. These recent reports caused us to advise the Mayor in early December 2011 of his obligation to prevent retaliation. (Letter attached as Exhibit B).

## VI.    Remedial Measures

Our investigation reveals that EHPD engages in biased policing against Latinos in violation of the Fourteenth Amendment to the United States Constitution and in violation of federal law. EHPD officers intentionally target Latinos for traffic enforcement activities, and subject Latinos to disparate, discriminatory treatment after traffic stops. EHPD has willfully enabled the discriminatory conduct of its officers by failing to institute generally accepted policing practices that would allow appropriate training, oversight, and supervision. The following remedial measures must be implemented in order to correct the constitutional and statutory deficiencies identified above.

### a.    General Policies and Procedures

- EHPD must update all of its policies for conformity with generally accepted police practices, for internal consistency, and for ease of use within the Department. EHPD policies should be supplemented by a comprehensive code of conduct that describes permitted and prohibited officer activity with specificity. Among the policies that EHPD must update and expand are those policies governing the handling of complaints, conduct of internal investigations, handling of discipline, and the responsibilities of supervisors.

- EHPD must develop a comprehensive non-discrimination policy that forbids EHPD officers from using race, color, ethnicity, or national origin in conducting stops or detentions, or activities following stops or detentions, except when engaging in appropriate suspect-specific activity to identify a particular person or group suspected of specific criminal conduct.

### b.    Training

- EHPD must effectively train its officers on its policies and practices, and provide updated training to its officers on a regular basis, including at roll-call, in the field, and at scheduled training sessions.

- EHPD must effectively train its deputies in the specific areas of non-biased policing, the requirements of policing diverse communities, community outreach, and procedural justice.

c.      **Data Collection and Analysis**

- EHPD officers must document all of its traffic and pedestrian stops accurately and completely, including the race or ethnicity of the driver and passengers, the violation that led to the stop, and the post-stop action taken with regard to the violation.

- Documentation submitted by patrol officers must be audited by supervisors and by the chain of command for completeness and accuracy. The collected data should then be subjected to meaningful analysis to enable detection of any trends of unlawful behavior and, if possible, early interventions to prevent unlawful behavior.

d.      **Risk Management**

- EHPD must develop and implement a risk management system that incorporates, organizes, and synthesizes data regarding officer conduct. This system should include information from a variety of sources, including complaints, uses of force, officers' arrest and traffic stop activity, field interviews, and consent stops and searches.

- EHPD must use this risk management system as a regular supervisory tool to promote civil rights, to manage risk and liability through early intervention and discipline, and to evaluate all EHPD personnel.

e.      **Language Access**

- EHPD must develop and implement a comprehensive language access program that will enable persons of limited English proficiency full access to the services that EHPD provides and that will enable EHPD officers to fully and effectively carry out their duties when encountering such persons.

- EHPD's development of a language access program must include routine and detailed training of its officers on this program and development of detailed policies describing the obligations of EHPD officers and staff relating to language access. The program should be characterized by such features as a clear mandate to use formal language services, such as a language line; translated signs, forms, and websites, and other documents; and command-level responsibility for the provision of these services.

f.      **Immigration Enforcement**

- Should it choose to continue enforcement of immigration laws, EHPD must develop clear policies on immigration enforcement so that it and its officers are in a position to be and are at all times in compliance with and responsive to DHS policies, practices, and directions. EHPD must provide

training and oversight to ensure that officers adhere to its immigration enforcement policy consistently and in a non-discriminatory manner.

- Due to its history of discrimination and to regain the community's trust and prevent haphazard immigration enforcement, EHPD must limit officer enforcement actions related to immigration law to only those officers who have received comprehensive training in immigration law equivalent to the training that ICE offers state and local agencies that have formal enforcement relationships with ICE. In particular, EHPD officers who engage in any enforcement activity related to immigration law must be comprehensively trained on the parameters of immigration law, including the elements of all civil and criminal violations of immigration law, on federal enforcement priorities in immigration law, on the nature of state and local cooperation with the federal government, and on the special requirements for preserving civil rights in an immigration enforcement context. Immigration enforcement activity carried out by an untrained EHPD officer must be treated as a violation of EHPD policy and code of conduct and appropriate discipline applied.

**g.   Community Policing**

- EHPD must establish a comprehensive program of community outreach based on its responsibilities to provide policing services to all the communities it serves. This program should include promotion and execution of the principles of community policing, including partnerships with stakeholders and community members in all East Haven communities in order to promote public safety and proactive crime control.

- EHPD's community outreach program must also include establishing community liaisons that are able to effectively communicate with the communities that EHPD serves in their native language. EHPD must also provide public forums so that community concerns relating to public safety may be voiced and EHPD enforcement strategies and priorities explained to those impacted by them.

*          *          *

The constitutional and statutory violations identified in these findings can only be remedied with the persistent commitment and engagement of EHPD, town officials, and key community stakeholders. These violations are serious and longstanding, and have become engrained in the culture of this Department. Sustainable reform will require a formal court-ordered and monitored remedy. We recognize that not all members of EHPD have engaged in the misconduct described above, and many EHPD officers strive to provide vital policing services while at the same time respecting the constitutional rights of East Haven residents. Enacting the reforms outlined in this letter will make every officer's job easier and more rewarding.

We will be in touch with you in the coming days to discuss a path forward.  We look forward to working with you to implement prompt and effective solutions to these issues.  If you have any questions regarding this letter, please call Jonathan M. Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-6255.

Sincerely,

Thomas E. Perez
Assistant Attorney General